Clarence KAYES; Gene Kennedy; Sharon Kennedy; Wiley Lacy; John R. Maurer; Lester Reynolds; Shirley Reynolds; Hollis Rollins; Donald Filby; Jack Miller; James Lovell; Paul S. Brady; Wilfred A. Blain; Lloyd S. Tucker; Donald J. Schoenhofer, Plaintiffs–Appellants,

v.

PACIFIC LUMBER COMPANY; Maxxam Group, Inc.; Maxxam, Inc.; Charles Hurwitz; Paul N. Schwartz; James Iaco; William Leone, Defendants–Appellees.

Clarence KAYES; Gene Kennedy; Sharon Kennedy; Wiley Lacy; John R. Maurer; Lester Reynolds; Shirley Reynolds; Hollis Rollins; Donald Filby; Jack Miller; James Lovell; Paul S. Brady; Wilfred A. Blain; Lloyd S. Tucker, Plaintiffs–Appellees,

v.

PACIFIC LUMBER COMPANY; Maxxam Group, Inc.; Maxxam, Inc.; Charles Hurwitz; Paul N. Schwartz; James Iaco; William Leone, Defendants–Appellants.

Nos. 93–16271, 93–16575.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1994.

Decided April 10, 1995.

Alfred H. Sigman, Sigman, Lewis & Feinberg, Oakland, CA, for plaintiffs-appellants-cross-appellees.

Kathleen V. Fisher and James F. McCabe, Morrison & Foerster, San Francisco, CA, for defendants-appellees-cross-appellants.

Timothy Hauser, U.S. Dept. of Labor, Washington, DC, for amicus Secretary of Labor.

Warren Gorlick, American Ass'n of Retired Persons, Washington, DC for amicus American Ass'n of Retired Persons.

Before: CHOY, POOLE, and REINHARDT, Circuit Judges.

CHOY, Circuit Judge:

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of an action brought by Plaintiffs under the Employee Retirement Income and Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., on behalf of beneficiaries and participants of the Pacific Lumber Company Pension Plan ("the Plan"). Plaintiffs are former employees, or eligible spouses of former employees of Pacific Lumber Company ("PLC") or of its subsidiaries. Defendant Charles Hurwitz is principal owner of Maxxam, Inc. ("Maxxam"), which owns Maxxam Group Inc. ("MGI"), which in turn owns PLC. Maxxam and MGI are also defendants. Defendant William Leone is the former President and CEO of PLC, and former director of Maxxam and MGI. Defendants Schwartz and Iaco are present or former executives of Maxxam or MGI.[1]

This action was filed in response to the termination in 1986 of the Plan, and the subsequent purchase by PLC of a group annuity contract from Executive Life Insurance Company ("ELIC"). The Plan termination followed the successful hostile takeover of PLC by MGI in the fall of 1985. The takeover was financed by $450 million in "junk" bonds, nearly $100 million of which were purchased by ELIC.

Effective March 31, 1986, PLC terminated the Plan. Pursuant to the Plan's terms, the Plan's fiduciaries chose to pay lump sums to Plan participants with less than $3,500 in vested benefits. For the rest of the participants and beneficiaries, PLC initiated a bidding procedure to obtain a group annuity contract to pay vested retirement benefits. ELIC was added to the list of potential bidders at Hurwitz's insistence. On October 1, 1986, despite negative evaluations (the details of which are relevant to the underlying lawsuit, but not to the outcome of this appeal), ELIC was selected to provide the group annuity. ELIC's bid was the lowest offered, $2.7 million lower than the next lowest bid. In accepting this bid, $62 million in "surplus" Plan assets were captured by defendants pursuant to the terms of the Plan.

Plaintiffs filed this suit on September 25, 1989, contending that the above transactions were in violation of the fiduciary duties of ERISA § 404, 29 U.S.C. § 1104, and constituted prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

ELIC was taken over by the State of California on April 11, 1991, due to its precarious financial condition. Payments were suspended for a short time, and resumed at 70% in May. Subsequently, a Stipulated Order was entered on August 14, 1991, under which PLC agreed to make up retroactively and progressively any shortfall in payments due from ELIC, provide Plaintiffs' counsel with 45 days notice prior to termination of such payments, and notify all Plan participants of pendency of the litigation and of the terms of the agreement.[2] The California conservatorship concluded with the transferring of all of ELIC's "restructured" liabilities to a newly formed Aurora Life Assurance Co. Aurora's financial stability is undetermined at this point.

On June 12, 1991, the Secretary of Labor filed an action against the same defendants alleging violations of ERISA §§ 404 & 403, 29 U.S.C. §§ 1104 & 1103, based on the purchase and selection of an annuity. *Reich v. Pacific Lumber Co.*, No. C–91–1812–SBA (N.D.Cal. filed June 12, 1991). The two actions were not formally consolidated, but were treated as related cases and proceeded concurrently pursuant to the same pretrial order.

On March 8, 1993, Defendants moved for summary judgment on the grounds that ERISA's fiduciary duty provisions are inapplicable to the selection of an annuity provid-

---

1. For the purposes of this opinion, all the plaintiffs are collectively referred to as "Plaintiffs," unless referred to individually; the defendants are referred to as "PLC" or "Defendants," unless referred to individually. Arguments put forth in the Defendants' briefs are attributed to "PLC," even though PLC is only one defendant. The

Secretary of Labor is referred to as "the Secretary," or "the Secretary of Labor."

2. There is some dispute as to whether the above concessions were made voluntarily or under threat of litigation. However, the voluntariness of the concessions is irrelevant to this appeal.

er, and that the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, precludes relief. The district court rejected both these assertions. PLC has filed a cross-appeal solely as to the holding regarding the McCarran–Ferguson Act.

On April 14, 1993, the district court denied Plaintiffs' request for class certification, finding that the action instead had to be maintained as a derivative suit pursuant to Fed. R.Civ.P. 23.1, and ordered Plaintiffs to file an amended complaint. The district court also dismissed certain named plaintiffs as inadequate representatives, and ordered Plaintiffs' counsel to withdraw from representing certain persons and entities with whom it found potential for conflicts of interest. Plaintiffs appeal this order in its entirety.

On May 11, 1993, Defendants moved for summary judgment on the two § 406 prohibited transactions claims. This motion was granted. Plaintiffs appeal this judgment.

On May 17, 1993, the district court held that PLC, Hurwitz, and Leone were fiduciaries as a matter of law, and that summary judgment as to the fiduciary status of the other defendants could not be determined as a matter of law due to unresolved issues of fact. PLC cross-appeals this order. In the same order, the district court held that Plaintiffs were no longer participants or beneficiaries under ERISA because the group annuity purchase provided them with an irrevocable commitment to payment of all vested benefits. Therefore, the district court held that they lacked standing to sue for any breach of fiduciary duty in the choice of the group annuity. On July 17, 1993, this holding was affirmed on reconsideration. Plaintiffs appeal this order.

Plaintiffs made two motions for interim attorneys fees, on June 13, 1992 and on July 26, 1993. Both were denied on the basis that they were premature; the second was also denied for lack of standing. Plaintiffs appeal this holding.

## II. DISCUSSION

### A. Plaintiffs' Standing

█ The district court held that Plaintiffs lacked standing to sue within the meaning of 29 U.S.C. § 1132(a)(2) as they were no longer "participants" of a pension plan because the Plan had terminated prior to their commencing this action. Standing is a question of law which we review de novo. *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994).

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides: "A civil action may be brought—(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." A participant is defined as "any employee or former employee of an employer or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan." ERISA § 3(7), 29 U.S.C. § 1002(7). The district court followed this court's reasoning in *Kuntz v. Reese*, 785 F.2d 1410 (9th Cir.) (per curiam), *cert. denied*, 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986), which held that former pension plan participants and beneficiaries who had received all of the vested benefits owed to them under the plan no longer had standing to sue on behalf of the terminated plan. The *Kuntz* court reasoned:

> Kuntz plaintiffs are not participants because, as former employees whose vested benefits under the plan have already been distributed in a lump sum, the Kuntz plaintiffs were not "eligible to receive a benefit," and were not likely to become eligible to receive a benefit, at the time that they filed the suit. Because, if successful, the plaintiffs' claim would result in a damage award, not in an increase of vested benefits, they are not plan participants.... any recoverable damages would not be benefits from the plan.

*Id.* at 1411. The district court declined to apply an exception to the *Kuntz* holding created in *Amalgamated Clothing & Textile Workers Union, AFL–CIO v. Murdock*, 861 F.2d 1406, 1408 (9th Cir.1988), which permitted former plan participants to pursue the equitable remedy of a constructive trust imposed on the plan fiduciary's ill-gotten profits.

■ Congress has since directly addressed the ability of former pension plan participants and beneficiaries to bring suit under ERISA. The Pension Annuitants Protection Act of 1994 ("PAPA"), Pub.L. No. 103–401 (Oct. 22, 1994), amends ERISA § 502(a), 29 U.S.C. § 1132(a), to clarify that former participants or beneficiaries of terminated pension plans have standing to seek relief where, as here, a fiduciary breach has occurred involving the purchase of insurance contracts or annuities in connection with their termination as plan participants.[3] Section 2 of PAPA, 29 U.S.C. § 1132(a)(9), provides:

[ (a) A Civil action may be brought ...] (9) in the event that the purchase of an insurance contract or insurance annuity in connection with the termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title or the terms of the plan, by the Secretary, *by any individual who was a participant or beneficiary at the time of the alleged violation,* or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts.

(emphasis added). PAPA represents, in part, a negative response to the district court's ruling in this case. As Representative Williams asserted:

S. 1312 does not represent a change from current law, but rather a clarification made necessary because of recent court decisions. The courts have wrongly held that

annuitants are not plan participants and therefore lack standing under ERISA to challenge the decision of the plan fiduciary to dispose of plan assets by purchasing annuities ... S. 1312 is designed to overturn this line of specific court cases.

130 Cong.Rec. H 10621 (Oct. 3, 1994).[4]

Accordingly, under ERISA § 502(a)(9), 29 U.S.C. § 1132(a)(9), Plaintiffs have standing to sue for "appropriate relief, including the purchase of a back-up annuity to remedy the breach." 139 Cong.Rec. S 9874, 9874 (July 29, 1993) (Sen. Metzenbaum). We reverse the dismissal of Plaintiffs' suit.

## B. The Application of the McCarran–Ferguson Act to ERISA

■ In its cross-appeal, PLC argues that the district court erred in holding that Plaintiffs' claims are not barred by the McCarran–Ferguson Act. They claim that the McCarran–Ferguson Act prohibits the construction of ERISA upon which Plaintiffs' suit is based. Specifically, Defendants argue that Plaintiffs' construction of ERISA violates McCarran–Ferguson because it would impose liability for selecting ELIC as an annuity provider even though ELIC is licensed and regulated by California's comprehensive insurance regulatory system. The McCarran–Ferguson Act, in relevant part, states: "No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). The applicability of the McCarran–Ferguson Act to ERISA is a question of law, which we review de novo. *See General Motors Corp. v. California Bd. of Equalization,* 815 F.2d

3. PAPA clearly applies to this case as it states that "[t]he amendments made by this Act shall apply to any legal proceeding pending, or brought, on or after May 31, 1993." PAPA § 5. Because we conclude that PAPA controls our analysis of Plaintiffs' standing, we do not need to consider whether the district court erred in declining to apply the exception to *Kuntz* set forth in *Amalgamated Clothing.*

4. *See also* 139 Cong.Rec. S 9874 (July 29, 1993) (Senator Metzenbaum, one of the bill's sponsors, stating "this legislation is needed because of an

unexpected decision by the U.S. Supreme Court 2 months ago"); 140 Cong.Rec. H 10621, 10622 (Oct. 3, 1994) (Secretary of Labor Robert Reich arguing that the amendment "is an important step in overcoming the problems created by Mertens and Kayes."); *id.* (statement by Representative Barrett); *id.* (statement by Representative Goodling). *See Mertens v. Hewitt Associates,* —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Kayes v. Pacific Lumber Co.,* C–89–3500 SBA, C–91–1812 SBA, 1993 WL 187730, 1993 U.S.Dist. LEXIS 7280 (N.D.Cal. May 17, 1993).

1305, 1309 (9th Cir.1987), *cert. denied,* 485 U.S. 941, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988); *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ The McCarran–Ferguson Act, by its own terms, does not preclude a construction of a federal statute that would affect state law if the congressional act "specifically relates to the business of insurance." 15 U.S.C. § 1012(b).. Therefore, it must first be determined whether ERISA in general, or the section of ERISA relied upon by Plaintiffs in particular, "specifically relates to the business of insurance." *Id.*

In *Hewlett–Packard Co. v. Barnes,* 571 F.2d 502, 505 (9th Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978), we held that California's Knox–Keene Act was preempted by ERISA to the extent that it attempted to regulate ERISA covered employee benefit plans as part of its comprehensive health care service legislation. It was claimed that because the Knox–Keene Act is a state law regulating insurance, construing ERISA to preempt it would violate the McCarran–Ferguson Act. We rejected that argument:

> [A]ppellant's argument not only ignores those ERISA sections that undeniably "specifically relate" to the business of insurance, but also overlooks ERISA's "deemer" clause, which states that an employee benefit plan shall not be deemed to be engaged in the business of insurance for the purposes of state law. If McCarran–Ferguson applies, therefore, ERISA falls within the clause excepting federal laws that "specifically relate" to the business of insurance.

*Id.* at 505 (citations omitted). PLC asserts that the pronouncement in *Hewlett–Packard* that ERISA falls within the "specifically relates" exception does not indicate that ERISA in its entirety relates to the business of insurance. Rather, it contends that *Hewlett–Packard* holds only that the portion of ERISA which prohibits state laws from regulating employee benefit plans by treating them as insurance companies falls within the "specifically relates" exception.

The resolution of this issue turns on whether ERISA in its entirety "specifically relates" to insurance, or whether only those sections of ERISA which explicitly deal with insurance should be deemed to "specifically relate" to insurance. We find guidance in the Supreme Court's opinion in *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* —— U.S. ——, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993). The issue in *Harris Trust* was whether the contract was a "guaranteed benefit policy" under ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2). As a preliminary matter, the Supreme Court held that the McCarran–Ferguson Act did not preclude application of ERISA's fiduciary standards to the insured's management of assets held under the contract. "Instead, we hold, ERISA leaves room for complementary or dual federal and state regulation, and calls for federal supremacy when the two regimes cannot be harmonized or accommodated." *Id.* at ——, 114. S.Ct. at 525. In rejecting the McCarran–Ferguson Act preclusion, the Court stated:

> But as the United States points out, "ERISA, both in general and in the guaranteed benefit policy provision in particular, obviously and specifically relates to the business of insurance." Thus, the McCarran–Ferguson Act does not surrender regulation exclusively to the States so as to preclude the application of ERISA to an insurer's actions under a general account contract.

*Id.* (citation omitted).

PLC contends that just as in *Hewlett–Packard,* the Court's holding in *Harris Trust* is not conclusive on this issue, because the Court was primarily concerned with the scope of ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2), which specifically refers to the business of insurance.[5] There are two flaws in PLC's argument. First of all, it is refuted

---

**5.** 29 U.S.C. § 1101(b)(2) reads: "In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer." The statute goes on to define "insurer" and "guaranteed benefit policy."

by the broad language used by the Supreme Court. The Court states that "*both* in general and ... in particular" ERISA relates to the business of insurance. *Id.* (emphasis added).[6] Secondly, PLC misreads the saving clause in ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A), to be evidence that the McCarran–Ferguson Act reserves the business of insurance to the states.[7] It is true that this court has held, and the Supreme Court has implied, that the effect of ERISA's saving clause was to preserve the McCarran–Ferguson Act's reservation of insurance regulation to the state. *See General Motors Corp.*, 815 F.2d at 1310; *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 744 n. 21, 105 S.Ct. 2380, 2391 n. 21, 85 L.Ed.2d 728 (1985). However, in *Harris Trust* the Court rejected the argument that the saving clause always prevents application of ERISA:

> [W]e discern no basis for believing that Congress, when it designed ERISA, intended fundamentally to alter traditional preemption analysis. State law governing insurance generally is not displaced, but "where [that] law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," federal preemption occurs.... As the United States recognizes, "dual regulation under ERISA and state law is not an impossibility[;] [m]any requirements are complementary, and in the case of a direct conflict, federal supremacy principles require that state law yield."

— U.S. at ——, 114 S.Ct. at 526 (citations omitted).

"No decision of this Court has applied the saving clause to supercede a provision of ERISA itself." *Id.* at —— n. 9, 114 S.Ct. at 526 n. 9. If this court were to accept PLC's argument, it would be the first decision of any court to apply the McCarran–Ferguson Act to supercede a provision of ERISA.

■ We find that the saving clause was inserted into ERISA specifically because ERISA relates to insurance, and Congress intended to prevent ERISA from preempting state insurance laws. The logical reading of the statutes and the Court's opinion in *Harris Trust* is that ERISA is not subject to the McCarran–Ferguson Act because ERISA relates to insurance. Although the saving clause generally precludes the application of ERISA's broad preemption provision to state insurance laws, that clause does not prevent the application of ERISA's fiduciary standards in areas governed by state insurance laws.[8] Accordingly, the district court was correct in finding that the McCarran–Ferguson Act does not bar the Plaintiffs' claims.

### C. *Fiduciary Status of the Defendants*

On cross-appeal, PLC asserts that the district court erred in ruling that, as a matter of law, defendants Hurwitz and Leone were Plan fiduciaries (thus granting the Secretary of Labor's and arguably Plaintiffs' motion for summary judgment), and that the status of defendants Schwartz, Iaco, MAXXAM and MGI could not be decided as a question of law (thus denying Plaintiffs' motion for summary judgment as well as Defendants' cross-motion for summary judgment).

### 1. Is the Issue Properly Before This Court?

■ Before addressing the merits of the district court's fiduciary status holdings, we must determine whether we have jurisdiction to consider the issue. The question of jurisdiction arises because the district court ad-

---

6. In addition, the Court noted that it had already recognized the " 'deliberately expansive' character of ERISA's preemptive provisions in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45–46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987)." *Id.*, —— U.S. at —— n. 8, 114 S.Ct. at 525 n. 8. In *Pilot Life*, the Court observed that the legislative history of ERISA "emphasized both the breadth and importance of the pre-emption provisions" of ERISA. 481 U.S. at 46, 107 S.Ct. at 1552.

7. ERISA's saving clause, 29 U.S.C. § 1144(b)(2)(A), states: "Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any persons from any law of any State which regulates insurance, banking, or securities."

8. ERISA's legislative history also indicates that the McCarran–Ferguson Act does not preempt ERISA's fiduciary standards because ERISA relates to insurance. *See* S.Rep. No. 127, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4871 & 4883.

dressed the summary judgment motion of the Plaintiffs in this action as well as that of the Secretary of Labor in the related action, *Reich v. Pacific Lumber*, No. C–91–1812–SBA (N.D.Cal. filed June 12, 1991). The current case and the Secretary's action were treated as related cases, and the two cases proceeded concurrently pursuant to the same pretrial order. On May 11, 1993, the district court heard arguments regarding motions in both actions concerning the fiduciary status of Defendants. However, at the same time, it heard arguments regarding Plaintiffs' standing as "participants" as discussed above. In an order filed on May 17, 1993, the district court held that defendants Hurwitz and Leone were plan fiduciaries and granted summary judgment on this point, but as to the other defendants, summary judgment was denied. At the same time, the district court held that Plaintiffs lacked standing.

Because only Plaintiffs' action is being appealed at this time (the Secretary's action having been stayed pending the outcome of this appeal), it is asserted that the district court did not rule on the fiduciary status of Defendants in the case at bar, but only made the ruling as to the Secretary's action. PLC takes the position that the district court divested itself of jurisdiction over Plaintiffs' action when it ruled that Plaintiffs lacked standing, and so only ruled on the fiduciary duty question in the Secretary's suit.

In the preamble to the district court's May 17 order, the court summarized that at the hearing on May 11, 1993:

> For the reasons stated at oral argument, the court ... granted plaintiffs' cross-motions for summary adjudication in both cases regarding the fiduciary status of defendants Charles Hurwitz and William Leone; denied the plaintiffs' cross motion and the defendants' motion for summary adjudication in both cases regarding the fiduciary status of defendants Maxxam, Inc., Maxxam Group, Inc., Paul Schwartz and James Iaco.
>
> Defendants' motion for summary judgment for lack of standing in the *Kayes* case was taken under submission.

*Kayes v. Pacific Lumber Co.,* Nos. C–89–3500 SBA, C–91–1812 SBA, 1993 WL 187730, at *1, 1993 U.S.Dist. LEXIS 7280, at *1–2 (May 17, 1993). In the body of the Order, the district court held that Plaintiffs lacked standing and dismissed their action. At the conclusion of this Order, the court stated "IT IS HEREBY ORDERED THAT ... (2) The Secretary's motion for summary adjudication of the fiduciary status issue is GRANTED with respect to defendants Pacific Lumber, Charles Hurwitz, and William Leone. With respect to other defendants, the motion and cross-motion for summary adjudication of the fiduciary status is DENIED." *Id.* at *3, 1993 U.S.Dist. LEXIS 7280, at *6–7.

The preamble to the order reveals that the court ruled on the fiduciary status issue in both cases. The court's statement in the written Order, holding that the Secretary's motion is granted in part and denied in part, reflects the fact that the court determined that Plaintiffs lacked standing and therefore dismissed their case. Once it found that Plaintiffs lacked standing, the district court no longer had jurisdiction over their claims and so only had to rule on the Secretary's motion at the conclusion of the Order.

We find that the issue of fiduciary status is properly before this court. The district court ruled orally on the issue as it related to both parties. The fact that it later found that Plaintiffs lacked standing does not change the finality of that order.

### 2. Fiduciary Status of Hurwitz and Leone as a Matter of Law

■ PLC argues that the district court erred in finding that, as a matter of law, Hurwitz and Leone were fiduciaries of the Plan. This court reviews the grant of summary judgment de novo, viewing all evidence in the light most favorable to PLC, the nonmoving party. *See Wang Laboratories, Inc. v. Kagan,* 990 F.2d 1126, 1128 (9th Cir.1993). The facts are not in question here; it is purely a question of law that we must determine.

■ PLC asserts that Hurwitz and Leone were not fiduciaries because they acted solely on behalf of PLC, who was the named fidu-

ciary in the Plan. Under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), every plan must have a named fiduciary with authority to administer the plan. ERISA permits corporations to be fiduciaries. *See* ERISA § 3(9), 29 U.S.C. § 1002(9) (definition of "person" includes corporation, and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) defines fiduciary in terms of a "person"); *Confer v. Custom Eng'g Co.,* 952 F.2d 34, 36 (3d Cir.1991).

The Plan at issue named the corporation PLC as the Plan fiduciary. Pacific Lumber Company Retirement Plan, § 11(b). It further went on to provide that the Company could delegate fiduciary responsibilities, but that "[t]he Company's duties and responsibilities under the Plan not delegated to other fiduciaries ... shall be carried out by the Company's directors, officers and employees, acting on behalf of and in the name of the Company ... and not as individual fiduciaries." *Id.,* § 11(e).

■ PLC's proffered ground for error rests on the contention that where a corporation is the named fiduciary, the persons who act on behalf of the corporation do not become individual fiduciaries by virtue of those acts, even under the functional definition of fiduciary set forth in ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). PLC's argument lacks merit.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides a functional definition of a fiduciary which depends, in part, upon whether a person "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets...." The Supreme Court has held that ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties—and to damages—under § 409(a)." *Mertens v. Hewitt Assocs.,* —— U.S. ——, ——, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993) (citation omitted).

PLC does not claim that under this functional test Hurwitz and Leone are not fiduciaries. Instead, citing *Confer,* it asserts that because PLC acted solely on behalf of the corporation, only the corporation is a fiduciary, not its officers. In *Confer,* the Third Circuit held that "when an ERISA plan names a corporation as a fiduciary, the officers who exercise discretion on behalf of that corporation are not fiduciaries within the meaning of section 3(21)(A)(iii), unless it can be shown that these officers have *individual* discretionary roles as to plan administration." 952 F.2d at 37. The gist of the Third Circuit's holding is that where a corporation is designated as the plan fiduciary, an officer's actions will not render that officer a fiduciary where those actions are ones with which the designated named fiduciary is chargeable. In other words, when the named fiduciary does not designate the officer, either explicitly or impliedly, as a fiduciary, the officer is shielded from personally becoming a fiduciary, *id.,* so long as he acts within the corporate form. *See id.* at 38 n. 4.

Insofar as *Confer* holds that a corporate officer or director acting on behalf of a corporation is not acting in a fiduciary capacity if the corporation is the named plan fiduciary, we disagree with the Third Circuit's conclusion. The *Confer* holding is undermined by the decision of this court in *Yeseta v. Baima,* 837 F.2d 380 (9th Cir.1988), the text of ERISA, and the agency interpretations of ERISA. This court has held corporate officers to be liable as fiduciaries on the basis of their conduct and authority with respect to ERISA plans. In *Yeseta* we held that by withdrawing funds from plan assets a corporate officer of a plan sponsor was a fiduciary, whether or not the sponsoring corporation authorized him to make such withdrawals:

> Under § 1002(21), a fiduciary includes a person who "exercises any authority or control respecting management or disposition of [a plan's] assets." Whether Yeseta was authorized to make the $14,200 and the $25,000 withdrawals or not, he did exercise control over and disposed of Plan assets.... On this basis, Yeseta is a fiduciary under § 1002(21) whether or not he individually, or the business as an entity, incurred a benefit from the withdrawal.

*Id.* at 386. It was irrelevant for the purpose of § 1002(21) whether Yeseta was acting on

behalf of the corporation or outside of his authority. Either way, if he met the functional definition of § 1002(21), Yeseta was a fiduciary. Thus, *Yeseta* rejected the distinction relied upon in *Confer,* 952 F.2d at 37, between officers exercising discretion "on behalf of a corporation" and officers "hav[ing] individual discretionary roles."

PLC claims that *Yeseta* is distinguishable from both this case and *Confer,* because unlike the situation in *Confer,* where the corporation was named as the plan fiduciary, in *Yeseta* the corporate employer was not a named fiduciary. Rather, in *Yeseta,* two of the corporate employees were named fiduciaries. Therefore, the argument runs, Yeseta could not claim to have been exercising the fiduciary duty of the corporation, since the corporation was not a named fiduciary. PLC points out that *Confer* is the only case entirely on point in any federal circuit court. No other cases present the analogous situation in which a corporation is the named fiduciary, but the person acting on behalf of the corporation is charged with being a fiduciary.

Even if *Yeseta* were distinguishable on the ground suggested by PLC, the language of ERISA itself undermines the Third Circuit's holding and PLC's contentions. ERISA specifically provides for personal, as well as corporate, liability. 29 U.S.C. § 1109(a) provides that "[a]ny person who is a fiduciary ... who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable...." However, "fiduciary" and "named fiduciary" have separate definitions for purposes of the subchapter containing § 1109. The term "fiduciary" is defined "[f]or purposes of this subchapter" at 29 U.S.C. § 1002(21)(A), and it is a functional definition as noted above. In contrast, "named fiduciary" is given a separate and formal definition in 29 U.S.C. § 1102(a)(2):

> For purposes of this subchapter, the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B)

by such an employer and such an employee organization acting jointly.

There is no indication that an officer of a named fiduciary cannot be a fiduciary and the personal liability provision asserts that all fiduciaries will be held personally liable, without mention of named fiduciaries. 29 U.S.C. § 1109.

▪ Moreover, 29 U.S.C. § 1110 states that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." The section goes on to allow insurance of fiduciaries for potential liability, but not to permit relief from liability. *See* 29 C.F.R. § 2509.75–4 (1993) (interpreting the statute in the above manner). Here, PLC relies upon a statement in the Plan itself to establish that the officers of PLC are not acting as fiduciaries, but are acting on behalf of the corporation. Because that statement purports to relieve the officers from fiduciary responsibility or liability, under § 1110 it is void as against public policy. Application of § 1110 requires one to find first that the person in question is a fiduciary. However, the definition of who is a fiduciary under § 1110 is based on the person's functions, not the title conferred by the Plan. If the Plan itself could not define who was or was not a fiduciary, the § 1110 prohibition against relieving fiduciaries from liability would be rendered wholly ineffective. Therefore, we hold that any interpretation of the Plan which prevents individuals acting in a fiduciary capacity from being found liable as fiduciaries is void.

▪ Agency interpretations of ERISA indicate fiduciary status depends on an individual's functional role rather than title. In an ERISA bulletin answering questions, fiduciary status is consistently defined by reference to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A):

> D–3 Q: Does a person automatically become a fiduciary with respect to a plan by reason of holding certain positions in the administration of such plans?
>
> A: Some offices or positions of an employee benefit plan by their very nature

require persons who hold them to perform one or more of the functions described in section 3(21)(A) of the Act.... Persons who hold such positions will therefore be fiduciaries.

Other offices and positions should be examined to determine whether they involve the performance of any of the functions described in section 3(21)(A) of the Act.

29 C.F.R. § 2509.75–8 (1993) (Department of Labor). *See also id.,* Question D–4 (regarding members of an employer fiduciary's board of directors); *id.,* Question FR–16 (regarding a fiduciary who is not a named fiduciary). The agency interpretations favor finding fiduciary status for discretionary actions and creating personal liability for breach of the fiduciary duties to which those actions necessarily give rise.

■ Accordingly, we reject the Third Circuit's interpretation in *Confer* that an officer who acts on behalf of a named fiduciary corporation cannot be a fiduciary if he acts within his official capacity and if no fiduciary duties are delegated to him individually. The broadly based liability policy underpinning ERISA and its functional definition of "fiduciary" compel the conclusion that the district court correctly found that Hurwitz and Leone were fiduciaries as a matter of law. As one court noted:

> The legislative history is replete with indications of congressional concern to assure adequate protection for the interests of plan participants and beneficiaries beyond that available under conventional trust law. Applying a restrictive judicial gloss to the term "fiduciary" itself would, in effect, enable trustees to transfer important responsibilities to a largely immunized "administrative" entity.

*Eaton v. D'Amato,* 581 F.Supp. 743, 746 (D.D.C.1980) (citations omitted). Were we to accept PLC's argument, a corporation would be able to shield its decision-makers from personal liability merely by stating in the plan documents that all their actions are taken on behalf of the company and not in a fiduciary capacity. We find that this was not Congress's intent when it included the "named fiduciary" provision of 29 U.S.C. § 1102(a)(1). We therefore affirm the district court on this point.

### 3. Maxxam, MGI and Other Individuals' Fiduciary Status

■ PLC also contends that the district court erred in failing to find that as a matter of law, MAXXAM, MGI, Schwartz and Iaco were not fiduciaries.[9] PLC claims that there has been no showing of direct fiduciary responsibility. This claim lacks merit. Viewed in the light most favorable to the nonmoving party, the district court did not err in finding that a genuine issue of fact exists. While PLC is correct that fiduciary status rests on an objective evaluation of functions performed, and not on an individual's state of mind, such an objective evaluation will be based on questions of fact regarding discretionary duty and control that must be determined at trial.

### D. Class Action Certification

#### 1. Class Action or Derivative Suit

Plaintiffs allege that the district court erred in denying their motion for class certification. The district court found that Plaintiffs had alleged only a derivative cause of action and held that under Fed.R.Civ.P. 23 a derivative suit cannot proceed as a class action because the class representatives' claims were not typical of the class claims. The district court reasoned that under *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), "the beneficiaries in the present case do not have a direct claim. Thus, it is impossible for the present plaintiff's [sic] claims to be typical of the claims of the class, because they do not have a claim, rather they bring suit on behalf of the plan's claim." *Kayes v. Pacific Lumber Co.,* C–89–3500 SBA, C–91–

---

9. PLC is somewhat unclear as to under what theory the district court should have found Schwartz and Iaco to be fiduciaries. However, it is evident from the district court's opinion that it considered them together with MAXXAM and MGI. In addition, because Schwartz and Iaco were not officers, employees or directors of PLC, they could not be found not to have been fiduciaries under the *Confer* theory elaborated above.

1812 SBA, 17 Employee Benefits Cas. 1174 (N.D.Cal. filed April 14, 1993) ("Class Certification Order") at 5. Therefore, the district court held that Plaintiffs' suit had to be brought under Fed.R.Civ.P. 23.1 and ordered Plaintiffs to file a third amended complaint.

■■■■ Whether or not an ERISA claim may be brought as a class action is a question of first impression in this circuit. This is a question of law which we review de novo. *See generally, United States v. Yacoubian,* 24 F.3d 1, 3 (9th Cir.1994). We find that the district court erred in holding that an ERISA action must be brought under Rule 23.1 and therefore erroneously concluded that this suit could not be maintained as a class action.

The district court based its holding that an ERISA suit is derivative in nature on the Supreme Court's holding in *Russell* and on this court's interpretation of *Russell* in *Sokol v. Bernstein,* 803 F.2d 532 (9th Cir.1986). In *Russell,* the Court held that while ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a beneficiary to bring an action against a fiduciary under § 409 of ERISA, 29 U.S.C. § 1109, the recovery available under § 502(a)(2) inures to the benefit of the plan as a whole: "A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." 473 U.S. at 142, 105 S.Ct. at 3090. The Court held that extra-contractual compensatory or punitive damages based on emotional distress were not available for a breach of fiduciary duty under ERISA due to a delay in processing an individual's benefit claim.

Although the Supreme Court's holding in *Russell* was limited to § 409 of ERISA regarding fiduciaries' personal liability, this court has extended it to embrace § 502(a)(3), 29 U.S.C. § 1132(a)(3), which empowers certain parties to bring an ERISA action. *Sokol,* 803 F.2d at 535–36. In concluding that extra-contractual emotional distress damages were not available to a beneficiary under § 502(a)(3) of ERISA, this court expanded the *Russell* rationale that ERISA protections run to the plan, not to the beneficiaries:

"ERISA grants no private right of action by a beneficiary *qua* beneficiary; rather, it accords beneficiaries the right to sue on behalf of the entire plan if a fiduciary breaches the plan's terms." *Id.* at 536.

This rationale was followed in *Horan v. Kaiser Steel Retirement Plan,* 947 F.2d 1412 (9th Cir.1991), which held that beneficiaries could not maintain an ERISA breach of fiduciary duty claim because they sought a remedy on behalf of themselves rather than on behalf of the ERISA plan. "Under *Russell* and *Sokol,* the plaintiffs fail to present a fiduciary breach claim if the only remedy sought is for their own benefit, rather than for the benefit of the Plan as a whole." *Horan,* 947 F.2d at 1418.

*Sokol* and *Horan* reveal that this court has interpreted the Supreme Court's *Russell* opinion to prevent any suit under ERISA for extracontractual damages and to require that an ERISA suit cannot be maintained unless the remedy sought inures to the benefit of the plan. On this basis, the district court concluded:

> The logical result of reconciling *Russell* with the plain language of section 1132(a)(2) is that a participant or beneficiary who brings suit for breach of fiduciary duty, does so on behalf of the plan and not in his individual capacity. While the individual has standing to bring suit, and stands to gain if the suit is successful, his benefit is secondary or derivative of the plan's gain.

Class Certification Order at 4–5.

■■■■ In so concluding, the district court erred in its determination that this action is a "derivative" one which must be brought under Fed.R.Civ.P. 23.1. Although this suit may be characterized as "derivative" in the broad sense, it clearly does not fall within the terms of Rule 23.1. That rule applies only to derivative actions "brought by one or more *shareholders* or *members* to enforce a right of a *corporation* or of an *unincorporated association.*" (emphasis added). Plaintiffs here are not suing as "shareholders" or "members" to enforce the right of any "corporation" or "unincorporated association." Rather, they are suing as plan

beneficiaries to enforce the right of the plan against its fiduciaries. When a trust beneficiary brings a derivative suit on behalf of a trust, "the specific provisions of Rule 23.1 are not controlling." Charles A. Wright, *Law of Federal Courts* § 73 at 525 (5th ed. 1994).

As the Supreme Court made clear in *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 535 n. 11, 104 S.Ct. 831, 838 n. 11, 78 L.Ed.2d 645 (1984), not every "derivative" action falls under Rule 23.1. Rule 23.1 applies only to a narrow class of derivative suits: those brought by shareholders or members of a corporation or unincorporated association to vindicate a right which may properly be asserted by that corporation or association. *See, e.g., id.* at 535, 104 S.Ct. at 838 (refusing to apply Rule 23.1 where the shareholder plaintiff suing on behalf of the corporation sought to assert a right which could not properly be asserted by the corporation).

■ The Federal Rules of Civil Procedure single out the specific type of derivative action described in Rule 23.1 because the law has historically been particularly wary of allowing *shareholders* to sue on their *corporation's* behalf. Because of the fear that shareholder derivative suits could subvert the basic principle of management control over corporate operations, courts have generally characterized shareholder derivative suits as "a remedy of last resort." *Renfro v. FDIC*, 773 F.2d 657, 658 (5th Cir.1985).

Moreover, the law has generally imposed an intracorporate exhaustion requirement on plaintiffs in such cases. *See, e.g., Hawes v. City of Oakland*, 104 U.S. 450, 460–61, 26 L.Ed. 827 (1881). This requirement is reflected in Rule 23.1, which directs the shareholder plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to

obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." [10]

■ Neither the text of Rule 23.1 nor the concerns that motivate its separate treatment for shareholder derivative actions apply here, for the plaintiffs are not "shareholders" suing on behalf of a "corporation." Accordingly, we conclude that the district court erred in requiring the plaintiffs to file an amended complaint complying with that rule.

■ Moreover, the district court erred in concluding that the class representatives' claims were not "typical" under Fed.R.Civ.P. 23(a)(3). Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." There is no doubt that the named plaintiffs' claims are typical of the class claims. Defendants do not suggest that the named plaintiffs are subject to unique defenses or have different claims from those of any other member of the class. They rely only on the fact that Plaintiffs' common claim is a derivative one rather than a direct one. However, Rule 23(a)(3) imposes only the requirement that the class representatives' claims be typical, not that they be direct.[11] Therefore, we reverse the district court's determination that this suit may not be maintained as a class action.

2. Dismissal of Certain Plaintiffs as Inadequate Representatives

The district court dismissed plaintiffs Kayes, G. Kennedy, Lacy, Maurer, L. Reynolds, and Schoenhofer as inadequate class

---

10. However, Rule 23.1 itself imposes only a *pleading* requirement. It does not create any requirement that the plaintiff actually make a demand on the board or shareholders. The question whether a demand requirement exists depends on the applicable substantive law. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97, 111 S.Ct. 1711, 1716–17, 114 L.Ed.2d 152 (1991).

11. *Lewis v. Chiles*, 719 F.2d 1044, 1048–49 (9th Cir.1983), on which the defendants rely, is inapposite. In *Lewis*, we held that a *shareholder*

could not bring a derivative action on behalf of his *corporation* as a Rule 23 class action. Our holding did *not* rest on the proposition that *any* action which can broadly be characterized as "derivative" is inappropriate for class action treatment. Rather, our decision was based on the fact that the *specific type* of "derivative" action brought by the plaintiff—a derivative action by a *shareholder* on behalf of his *corporation*—must be brought under Rule 23.1. If our reasoning was based on a broader proposition, it did not survive *Daily Income Fund*.

representatives under Fed.R.Civ.P. 23.1 because it found them to be vindictive toward Defendants on the basis of "their long-standing, multiple grievances against the present defendants...." Class Certification Order at 17.

We review the district court's determination regarding adequacy of representation for an abuse of discretion. *Harmsen v. Smith,* 693 F.2d 932, 943 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

Vindictiveness is the eighth factor enumerated by this court in *Larson v. Dumke,* 900 F.2d 1363, 1367 (9th Cir.), *cert. denied,* 498 U.S. 1012, 111 S.Ct. 580, 112 L.Ed.2d 585 (1990), in its consideration of whether certain individuals were adequate class representatives. The district court based its finding that the dismissed plaintiffs were vindictive on three lawsuits filed by Maurer, Lacy, Filby, Kayes, L. Reynolds, and Schoenhofer against Defendants, and on the fact that Maurer campaigned for a seat on the Humbolt County Board of Supervisors based on an "anti-Maxxam platform." Apparently G. Kennedy was considered vindictive because he initiated an Employee Stock Option Plan in an attempt to buy PLC from defendant Maxxam.

The first lawsuit the district court relied upon, *Maurer v. Hurwitz,* Cal.Super.Ct. No. 76564, was a suit brought in state court seeking essentially the same remedy that is being sought in this case—to recover the reversion that PLC received upon the termination of the Plan. That suit was held to be preempted by ERISA, resulting in the present suit. *Maurer v. Hurwitz* shows no more vindictiveness towards Defendants than does the case at bar, but rather indicates a desire to enforce the same rights. The other two suits relied upon by the district court apparently were shareholder derivative suits regarding the leveraged buyout of PLC. While those suits reveal some animosity towards the directors of PLC for allowing the takeover, or towards Maxxam for taking over PLC, they hardly constitute evidence of vindictiveness to such an extent that these plaintiffs cannot adequately represent the class.

Although it was enumerated as a factor in *Larson,* there have been no cases in this circuit in which a plaintiff has been found to be an inadequate class representative on the basis of vindictiveness. The reason we consider vindictiveness as a factor in evaluating adequacy of representation is to render ineligible individuals who possess animus that would preclude the possibility of a suitable settlement. For instance, in *Lim v. Citizens Savings and Loan Ass'n,* 430 F.Supp. 802, 811 (N.D.Cal.1976), the defendant argued that "plaintiff's professed 'revenge' motive creates clear potential conflicts with the class because, in this frame of mind, plaintiff is likely to by-pass favorable settlement offers." Even in such a situation, however, the court did not find the vengeful plaintiff inadequate: "Indeed, the vengeance of an aggrieved person more often engenders the zealous prosecution essential to a class action than the *over*-zealous prosecution which may threaten to strangle a class action." *Id.* at 812.

Viewed in this light, the lawsuits relied on by the district court hardly demonstrate animus that would jeopardize the interests of the class. Rather, they indicate a desire to protect shared financial interests. Similarly, while it is possible that the plaintiffs might try to use the class action as leverage to obtain a settlement in such pending litigation, *see Davis v. Comed, Inc.,* 619 F.2d 588, 593–94 & 97 (6th Cir.1980), in the case at bar none of the litigation relied upon by the district court was still pending.

This court finds an abuse of discretion when it has a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors. A district court may abuse its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *United States v. Plainbull,* 957 F.2d 724, 725 (9th Cir.1992) (citations omitted). By giving undue weight to litigation which was neither pending, nor tending to show unusual animus towards Defendants other than a desire to protect named plaintiffs' rights, the district court

may have abused its discretion. On the other hand, two other factors mentioned by the district court—the attempt to buy out PLC from Maxxam by Kayes, G. Kennedy, and L. Reynolds, and the anti-Maxxam platform by Maurer in his campaign—are factors which could properly be considered by the district court in its determination.[12]

It is impossible to determine what weight the district court gave to each of these factors in its determination that the representatives were inadequate, or what standard it used in finding those representatives to be vindictive. Therefore, we remand this issue to the district court to reweigh the evidence, keeping in mind the policy behind considering vindictiveness as a factor in evaluating adequacy of representation.

### 3. Plaintiffs' Counsel's Potential Conflict of Interest

The district court also found that Plaintiffs' counsel possessed a potential conflict of interest because Plaintiffs' counsel also represents the PL Rescue Fund and named plaintiffs Filby and Lacy with respect to individual annuities not covered by the present suit. Therefore, the district court ruled that Plaintiffs' counsel had to eliminate these potential conflicts by withdrawing from representing the PL Rescue Fund and from representing Filby and Lacy in their individual suits.

Neither side has cited any case in opposition to or in support of the district court's ruling. Plaintiffs' claim of error seems to revolve around the one instance of a conflict cited by the district court regarding an instruction not to answer a question in a deposition. Plaintiffs claim that the district court erroneously perceived this instruction as an example of a conflict; rather, they argue, the instruction not to answer was based on the attorney-client privilege. It is impossible to discover to what instance the district court

was referring, as the court provided no citation to the record. Nonetheless, this argument misses the point of the district court's holding. The district court stated that, although there was no evidence that the Plan's representation had been compromised, withdrawal was necessary to eliminate *potential* conflicts. The district court had previously noted that the PL Rescue Fund had a broader mission than did the class, including pressuring Maxxam to sell its interest in Pacific Lumber.

■ "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Sullivan v. Chase Inv. Servs. of Boston, Inc.*, 79 F.R.D. 246, 258 (N.D.Cal. 1978). Plaintiffs argue that because the conduct of the litigation has shown no manifestation of divided loyalties, requiring withdrawal was improper. Plaintiffs misunderstand the law. The "appearance" of divided loyalties refers to differing and potentially conflicting interests and is not limited to instances manifesting such conflict. In *Sullivan*, the district court ordered withdrawal of counsel under a similar situation where there had as yet been no reason to believe improper influence had resulted from the representation of two parties with conflicting interests. *Id.* We find that the district court did not abuse its discretion in ordering Plaintiffs' counsel to withdraw from conflicting representation.

### E. Prohibited Transaction Claims

#### 1. The Purchase of Annuities from ELIC

Plaintiffs next contend that the district court erred in granting Defendants' summary judgment motion on Plaintiffs' claim that certain transactions were "prohibited transactions" within the meaning of ERISA § 406, 29 U.S.C. § 1106.[13] The first transac-

---

12. In addition, it appears that plaintiffs Filby (who was not dismissed) and Lacy (who was dismissed) may have had pending lawsuits against some of the defendants regarding individual annuities not covered by the present suit. If this is true, it would support dismissal of Lacy on the basis of *Davis*.

13. ERISA § 406, 29 U.S.C. § 1106, provides in relevant part:
   (a) Transactions between plan and party in interest
   Except as provided in section 1108 of this title: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a trans-

tion at issue involved Defendants' purchase of annuities from ELIC. Plaintiffs asserted that this purchase constituted a prohibited transaction because Defendants selected ELIC in order to maximize their recovery of surplus plan assets, and therefore constituted a transfer for the benefit of a party in interest or self-dealing.

■■■ This court rejected this same argument in *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1346 (9th Cir.1994):

> [P]urchasing replacement annuities as part of a plan termination even with such alleged infirmities is not the kind of transaction § 406 prohibits. As we explained in *M & R Inv. Co.*:
>
> > The party-in-interest prohibitions [under § 406(a)] act to insure arm's-length transactions by fiduciaries of funds subject to ERISA. A transaction with a party in interest is prohibited under the presumption that it is not arm's-length. The result is a broad per se prohibition of transactions ERISA implicitly defines as not arm's-length.
>
> 685 F.2d at 287. In other words, the transaction, itself, should communicate the breach. ERISA, however, permits the transaction that forms the basis for plaintiffs' § 406 claim—the purchase of annuities as part of a plan termination. *See* 29 U.S.C. § 1341(b)(3)(A)(i). Plaintiffs do not allege that either Executive Life or Provident is a party in interest. Absent such an allegation, we fail to see how purchasing annuities to terminate plaintiffs' Plan constitutes a per se violation of ERISA, even if accomplished through an infirm bidding process or for improper purposes. For the same reason, we also reject plaintiffs' § 406(b) claim.

*Id.* (quoting *M & R Inv. Co., Inc. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir.1982)). The district court correctly found that the pur-

action, if he knows or should know that such transaction constitutes a direct or indirect—

\*   \*   \*   \*   \*   \*

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. . . .

\*   \*   \*   \*   \*   \*

(b) Transactions between plan and fiduciary
A fiduciary with respect to a plan shall not—

chase of annuities from ELIC was not a prohibited transaction under ERISA § 406, 29 U.S.C. § 1106.

### 2. The Use of Residual Plan Surplus as Collateral

Plaintiffs allege that PLC also engaged in a prohibited transaction in violation of ERISA § 406, 29 U.S.C. § 1106, in obtaining a bridge loan to finance MGI's takeover of PLC. In obtaining the loan, PLC pledged as collateral the right to receive the future residual distributions from the Plan after the Plan's termination, the purchase of annuities, and other required distributions. Plaintiffs asserted below that this transaction violated the prohibition in § 406 on dealing with a plan asset for the benefit of a party in interest. The district court dismissed this claim, ruling that the pledge of collateral was not a prohibited transaction because the collateral pledged was a contingent right and not an actual plan asset.

Neither Plaintiffs nor Defendants cite any authority addressing whether a contingent right to receive plan surplus following distribution constitutes a plan asset. Defendants cite numerous cases supporting the proposition that residual plan assets can legally revert to the employer after plan termination. However, this point is not disputed and is inapposite to whether the use of a contingent right of reversion prior to plan termination constitutes a prohibited transaction. Defendants also cite case law on security interests indicating that the pledge of the right to receive anticipated funds is the pledge of a general intangible, not an interest in the underlying asset.

This court has adopted a broader functional definition of what constitutes an "asset of the plan" for purposes of § 406. In *Acosta v. Pacific Enterprises*, 950 F.2d 611 (9th Cir. 1991), this court stated:

> (1) deal with the assets of the plan in his own interest or for his own account,
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries. . . .

ERISA's legislative history makes clear that "the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." In light of Congress' overriding concern with the protection of plan participants and beneficiaries, courts have generally construed the protective provisions of § 406(b) broadly....

Appellees argue that the term "assets of the plan" encompasses only financial contributions received by the plan administrators. We decline to cabin the term in such a restrictive definition. Congress' imposition of a broad duty of loyalty upon fiduciaries of employee benefit plans counsels a more functional approach. To determine whether a particular item constitutes an "asset of the plan," it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries.

*Id.* at 620 (citations omitted). It is clear from *Acosta* that "assets of the plan" is not defined in strictly financial terms, but rather is determined by examining whether the "item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Id.* In *Acosta*, the alleged "asset of the plan" was a participant-shareholder list. In *Acosta*, however, we did not reach the question of whether or not this list was a plan asset; rather, we affirmed on the ground that the fiduciaries' use of the list did not constitute self-dealing. *Id.*[14]

■ Therefore, in this circuit there is a twofold functional test as to whether an item in question constitutes an "asset of the plan": (1) whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary, and (2) whether such use is at the expense of the plan participants or beneficiaries. In this case, it is unquestionable that the contingent interest at issue was used to

the benefit of the fiduciary, by helping finance the takeover. The question is whether it was used at the expense of the Plan participants.

■ PLC correctly points out that the loan transaction did not jeopardize the assets of the Plan, nor did it affect Plaintiffs' vested benefits under the Plan. The loan document cited by Plaintiffs, which indicates that the loan would be in default if the plan incurred liabilities, evidences the bank's concern with its future interest, but it does not in any way indicate that the bank would be able to reach plan assets upon such a default. Therefore, the Plan assets were never at risk by being indirectly put up as collateral.

In enacting ERISA, Congress was concerned about the mismanagement of plan assets to the detriment of the plan and its beneficiaries. Although in this case the Plan assets themselves were never put at risk, the Plan fiduciary used funds—which were plan assets—as collateral for a purpose which did not benefit the Plan. The purpose and end result of this use was the termination of the Plan. While this did not directly hurt the beneficiaries, since annuities were purchased, it can hardly be argued that it was for the benefit of the Plan.

It is clear from legislative history that in enacting § 406, Congress was not only concerned with deals between the plan and a fiduciary:

> As in other situations, this prohibited transaction may occur even though there has been no transfer of money or property between the trust and any party in interest. For example, securities purchases or sales by the trust in order to manipulate the prices of securities to the advantage of a party in interest constitute "a use by, or for the benefit of, a party in interest of any income or assets of the trust."

*Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1471 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). However, that case is not analogous, because here the assets potentially affected are vested funds of the plan, not unvested liabilities.

---

**14.** The only other case addressing the meaning of "assets of the plan" under § 406 is an Eleventh Circuit case which held that an employer's contingent and non-vested future retirement liabilities under a plan were not assets of the plan, and so could be used in the employer's own interest.

S.Rep. No. 383, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 4890, 4982. The legislative history goes on to indicate a policy against conflicting interests when contemplating termination:

> The bill also treats as a prohibited transaction investments which jeopardize the income or assets of the trust.... Of course, the prohibited transaction provisions do not prevent an employer, on termination of his plan, from recovering assets not needed to pay plan benefits.... If termination is contemplated, it should be clear that investments are not being made or maintained with the interests of potential remaindermen in mind in any case where this is in conflict with the interests of the participants or beneficiaries.

*Id.* at 4984–85.

■ In light of the legislative history revealing a policy against self-dealing in plan termination and this court's policy of interpreting the fiduciary duty broadly, we hold that the collateral for the bridge loan was a plan asset. Corporations should not be permitted to rely on their ERISA plan assets to finance takeovers or other risk ventures. One of the reasons § 406 was included in ERISA was that "Congress was apprehensive that exceptions to the common law rules against self-dealing were unduly eroding the underlying principle and included Section 406 as a barrier to such erosion." *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1215 (2d Cir.1987) (citing S.Rep. No. 127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4838, 4865). It is clear that the fiduciaries involved here had in mind only their own interests, or those of a party in interest, when setting up the bridge loan. Such conflicting loyalties should be discouraged. We reverse the district court's dismissal of this prohibited transaction claim.

## F. Interim Attorney's Fees

■ Plaintiffs contend that the district court erred in concluding that an interim award of attorney's fees is unavailable under ERISA. Whether or not interim attorney's fees are available under ERISA is a question of law, which we review de novo. *See United States For Use and Benefit of Reed v. Callahan,* 884 F.2d 1180, 1185 (9th Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990).

■ In an ERISA action by a participant, beneficiary, or fiduciary, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g). This language mirrors that regarding attorney's fees in civil rights actions. *See* 42 U.S.C. §§ 2000e–5(k), 2000a–3(b) & 1988. On the basis of nearly identical statutory language, we have held that as in civil rights cases awards of attorney's fees in ERISA litigation should ordinarily be granted:

> ERISA, like the Civil Rights Acts of 1871 and 1964, and the Labor–Management Reporting and Disclosure Act, is remedial legislation which should be liberally construed in favor of protecting participants in employee benefit plans. Section 502(g)(1), 29 U.S.C. § 1132(g)(1), authorizes the court to award attorney fees. This section "should be read broadly to mean that a plan participant or beneficiary, if he prevails in his suit under § 1132 to enforce his rights under his plan, 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"

*Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984) (citations omitted). We held that in applying the factors adopted by this court in *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446 (9th Cir.1980), the district court must keep these remedial purposes in mind because "[a]n important aspect of that protection [ERISA] is to afford [participants and beneficiaries] effective access to federal courts." *Smith,* 746 F.2d at 589.

Plaintiffs argue that the Supreme Court has authorized interim attorney's fees under these same civil rights statutes on which this court relied in determining that ERISA's attorney's fees statutes must be construed in

favor of attorney's fees absent special circumstances. *See, e.g., Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 790, 109 S.Ct. 1486, 1492–93, 103 L.Ed.2d 866 (1989); *Hanrahan v. Hampton,* 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (per curiam).[15] Therefore, Plaintiffs argue that by implication, the same interim attorney's fees should be available under ERISA.

The district court found that the policies behind ERISA, unlike those underlying civil rights statutes, do not justify interim attorney's fees. The court based this distinction on the fact that civil rights plaintiffs serve as "private attorneys general" in that they protect interests which benefit the general public. "In contrast, the policies underlying ERISA—while nevertheless important—'do not rise to the level of assuring that all citizens are accorded their civil rights.'" (quoting *Ellison v. Shenango Inc. Pension Bd.,* 956 F.2d 1268, 1275 (3d Cir.1992)). The district court reasoned that the ERISA plaintiff seeks a recovery only for a select number of individuals, not for the general public. Thus, less incentive in the form of attorney's fees is needed for private enforcement.

The cases on which the district court relied in denying attorney's fees were all cases dealing with whether or not to adopt the *Smith* "special circumstances rule" for awarding attorneys fees. *Ellison,* 956 F.2d at 1274–75; *Bittner v. Sadoff & Rudoy Indus.,* 728 F.2d 820 (7th Cir.1984); *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255 (5th Cir.1980). These cases used the same logic which the district court adopted to reject this standard under ERISA. However-

er, as noted above, in *Smith,* this court accepted the special circumstances rule, analogizing to the civil rights legislation. Therefore, the district court's conclusion is somewhat suspect, since it relied upon logic in cases which came to the opposite conclusion to that reached by this court in *Smith.*

Once we accept a "remedial" standard for attorney's fees in ERISA cases, as we did in *Smith,* there are few distinctions between the interim award of attorney's fees in the ERISA context and under civil rights statutes. In both contexts, the litigant may not be able to continue pursuing the litigation unless attorney's fees are awarded whenever any relief is obtained.

We hold that interim attorney's fees are available under ERISA to the extent that they are available under civil rights statutes. We reverse the district court on this issue and remand to determine whether Plaintiffs have prevailed on any issue, and whether the *Hummell* factors are met.[16]

**AFFIRMED IN PART AND REVERSED IN PART.**

---

15. It should be noted that interim attorney's fees under civil rights legislation are only available if a party has prevailed on the merits of at least some of its claims. *See Hanrahan,* 446 U.S. at 758, 100 S.Ct. at 1989. However, since the district court did not determine whether Plaintiffs prevailed on any claim, we need not reach that issue now. We only need examine whether or not interim attorney's fees are authorized under ERISA. The same holds true for the determination of whether the *Hummell* factors are met.

16. *Flanagan v. Inland Empire Elec. Workers Pension Plan,* 3 F.3d 1246, 1253–54 (9th Cir.1993) is not dispositive of this issue. In that case, this court merely held that the reversal of summary judgment finding that plaintiffs lacked standing was not enough to justify attorney's fees, and was premature. The gist of this court's opinion was that a reverse of a standing determination did not constitute success "'on any significant issue in litigation which achieves some of the benefit [they] sought in bringing suit.'" *Id.* at 1253 (quoting *Smith,* 746 F.2d at 589). Here, Plaintiffs claim to have achieved some benefit in the form of a Stipulated Order.